The relief described hereinbelow is SO ORDERED.

SIGNED this 1st day of December, 2014.



_____
Robert D. Berger
United States Bankruptcy Judge
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

**ADAM R. LONG,**
      **Debtor.**
                                                **Case No. 09-23473**

_____

**JAMES J. YODER,**
      **Plaintiff,**

      **v.**
                                                **Adv. No. 09-6172**

**ADAM R. LONG,**
      **Defendant.**

_____

### NUNC PRO TUNC MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S
### COMPLAINT AND DEFENDANT'S MOTION FOR SANCTIONS

At issue before the Court is whether the debt in the amount of $912,000[1] owed to James

J. Yoder (Plaintiff) by Adam R. Long (Debtor and Defendant) should be classified as

---

[1] $912,000 is the debt balance with accrued interest on October 16, 2009, the date on which Defendant filed this bankruptcy. The original debt was for loans that totaled $500,000. The Court calculates the debt based on simple interest of 30 percent per annum on $500,000 prorated through the petition date.

14.11.24 Yoder v. Long.wpd

nondischargeable under 11 U.S.C. § 523(a)(2)(A);[2] whether judgment should be entered in this amount in favor of Plaintiff against Defendant; whether discovery sanctions should be imposed on Plaintiff for his alleged failure to comply with the Court's Order of February 15, 2013; and whether Defendant's motion for directed verdict should be granted. Having read the briefs and considered the evidence presented at trial on February 20 and February 25, 2013, the Court finds that $285,000 of the original debt is not dischargeable as money or an extension of credit obtained by false pretenses, a false representation, or actual fraud. The Court finds that $215,000 of the original debt is not dischargeable as an extension, renewal, or refinancing of debt obtained by false pretenses, false representation, or actual fraud. The Court finds the balance due on the original debt, with accrued interest, on the bankruptcy petition date in the amount of $912,000 is excepted from discharge and enters judgment in Plaintiff's favor against Defendant in this amount.

The Court considers Defendant's Motion for Sanctions and oral motion for a directed verdict.[3] The Motion for Sanctions arises out of a discovery dispute that has been ongoing since the status conference on August 3, 2011. The issue is whether Plaintiff violated Rule 26 of the Federal Rules of Civil Procedure by refusing to provide copies of certain email conversations which were later uncovered by searching Plaintiff's laptop and email accounts. For the reasons

---

[2] All future references to a Code section, without more, are to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

[3] Defendant included a motion for sanctions in his trial brief (Doc. 109). He filed a supplemental motion for sanctions on March 11, 2013 (Doc. 114), and moved orally for a directed verdict at the trial. The Court treats Defendant's motion for directed verdict as one for judgment on partial findings under Fed. R. Civ. P. 52(c).

14.11.24 Yoder v. Long.wpd

set forth below, the Motion for Sanctions is granted in part. The Court took under advisement Defendant's oral motion for directed verdict made at trial. Pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, the Court declines to render judgment on the partial findings and defers to the statement of facts and conclusions of law below to fully set out the Court's judgment.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Reference to the Court of this proceeding is appropriate under 28 U.S.C. § 157(a) and Standing Order No. 13-1 of the United States District Court for the District of Kansas. This case is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The parties have stipulated to the jurisdiction of this Court.[4]

## FINDINGS OF FACT

At the time of trial, Defendant was 33 years old. He lived in California and worked as a broker for Ayre Investments. Defendant grew up in the Kansas City metropolitan area and was junior high school and high school classmates with Plaintiff's son, Jay Yoder, though they were not close friends. Plaintiff helped coach Defendant in eighth grade football. Plaintiff's son, Jay Yoder, lived with Defendant briefly in 1997 while the two lived in Florida. In 2000, Defendant moved back to the Kansas City metropolitan area. In 2003, Defendant, after meandering through the halls of tertiary education, graduated with a degree in business administration from the

---

[4] Doc. 100.

14.11.24 Yoder v. Long.wpd

University of Kansas with a GPA in the 3.6 to 3.7 range. That same year, Defendant briefly worked for Waddell and Reed as a financial advisor. Later in 2003, Defendant went to work for Wells Fargo Financial. Defendant worked for Wells Fargo for nine months where he sold consumer finance products, including home loans. Defendant did not close the consumer loans, but he did understand that the home loans were secured by a mortgage, and he understood the difference between secured and unsecured debts. By the time he was 24 years old, Defendant was the most successful originator in his Wells Fargo office. After nine months, he was promoted to a position in the Wells Fargo Home Mortgage Division, which provided subprime loans to less qualified applicants. These subprime loans were higher risk loans, which also carried a higher interest rate. Defendant did not handle the preparation of the closing documents or handle the closing of these loans, because it was the policy of Wells Fargo not to involve sales people at loan closings. Defendant testified that he worked at Wells Fargo in different capacities for approximately two years.

Starting in 2004, Defendant engaged in a business relationship with two other people with whom he purchased and rehabilitated Kansas City area homes and sold those homes at a gross profit of approximately $150,000 each. This practice is commonly known as flipping or rehabilitating houses for quick resale. Initially, this was a part-time venture for Defendant. In 2005, Defendant joined First National Mortgage Services (First National) where he brokered loans. He worked at First National until mid to late 2006. He understood that he was selling secured loans that required a mortgage or a deed of trust to secure the money loaned. In 2004, Defendant flipped or turned 30 to 100 properties. Many of these properties were lower in value,

- 4 -

and some were vacant lots on which a new home was constructed. Defendant soon ventured into the sale of higher value properties. It was common practice for lenders to finance 100 percent of the property purchase price and, in some instances, to loan additional funds that were used to rehabilitate, renovate or build residential properties. In all of these transactions, Defendant was personally involved and signed the closing documents, including the notes and mortgages.[5] Defendant also had considerable experience in originating home loan financing. Despite this expertise, at trial Defendant maintained that it was a promissory note, and not a mortgage, that is filed with the appropriate local authorities to perfect a lien for a real estate loan. This testimony is not credible and is inconsistent with other evidence adduced at trial. Defendant urges this Court to find a lack of sophistication that is incongruous with his talents, business experience, and acumen.

During the middle of 2006, Plaintiff, his son Jay, and Defendant all lived in the Kansas City metropolitan area.[6] In April or May of that year, Plaintiff and Jay encountered Defendant at a bar at which time the acquaintance between the parties was renewed. Although this was a social meeting, there were discussions regarding their work, and Defendant indicated to Jay that he was fully engaged in the business of flipping houses in Kansas City. There was discussion

---

[5] As to transactions in Missouri, a deed of trust is used in lieu of a mortgage; however, the function of both security documents is essentially the same, which is to secure the amount loaned with real property. Since the Kansas City metropolitan area straddles the Kansas-Missouri state line, these terms are used interchangeably.

[6] The Kansas City metropolitan area, including adjacent suburban developments in Kansas and Missouri, has approximately 2 million people. References to Kansas City include the entire metropolitan area.

14.11.24 Yoder v. Long.wpd

that Plaintiff had recently retired[7] and that he might wish to participate in Defendant's enterprise. Defendant testified that this meeting and subsequent meetings were his financial "courtship" of Plaintiff. Various witnesses testified that there were anywhere from five to fifteen subsequent meetings between Defendant and Plaintiff between April and November of 2006. Although these meetings were generally considered social, there were discussions of Defendant's house flipping business and Plaintiff's possible involvement in the business. Defendant described the early meetings between the two as relationship building with an eventual progression to more specific discussions regarding Defendant's business. During November and December 2006, a nascent business relationship formed.

Plaintiff's prior real estate investments were mostly personal in nature, although he did purchase a restaurant in Canada for his son to manage, a restaurant and bar in Mexico, and real estate investment trusts. Plaintiff's other investments were extensive and primarily focused in the aircraft industry, equities and financial instruments, not the purchase of real property.[8] Plaintiff's testimony established that he is a relational investor–that is, he develops a relationship of trust between himself and other parties to the investment or transaction.[9] He relies upon the

---

[7] During the middle of December 2006, an aircraft industry company in which Plaintiff held an equity interest was sold to a Fortune 500 company. From the sale, Plaintiff received net proceeds of approximately $10 million.

[8] Plaintiff's involvement in real estate was as an investor, not as a lender; here, he is a lender.

[9] Relational investing is not new. For instance, in 1901, Carnegie and Rockefeller agreed to the sale of the United States Steel Company during a short meeting in the latter's parlor. The price was established when Rockefeller wrote a figure between $250 million and $500 million on a piece of paper and Carnegie accepted. That sum was the purchase price. The transaction created the largest company in the United States at the time by market capitalization. Similarly, in 1983, Warren Buffett ("The Oracle of Omaha") purchased what would become Nebraska Furniture Mart after a brief glance at an unaudited financial statement. Mr. Buffett commented: "I had no worries.

- 6 -

14.11.24 Yoder v. Long.wpd

integrity and honesty of the other participant in the financial transaction or investment. Plaintiff is a successful investor, and his approach has served him well.

In November 2006, the parties reached an agreement in principle in which Plaintiff would loan $500,000 to bolster Defendant's house rehabilitation business, and the loan would carry a 30 percent interest rate. Plaintiff testified that he would not have the funds from the sale of his business venture until December 2006, so the initial agreement was that the entire investment would be made in January 2007. In December 2006, the parties met again and discussed the details of the loan. At this meeting, Defendant asked Plaintiff, "You want security for this [the loan]?" Plaintiff stated that he did. Either at this meeting, or at a separate meeting sometime in December, Defendant requested an advance of $200,000 on the loan. On December 2, 2006, Plaintiff agreed to loan Defendant $200,000 as an advance. At this time, no promissory note or mortgage was signed by the parties. The testimony is unclear whether the parties agreed to collateralize the loan when the $200,000 advancement was made. On January 18, 2007, Plaintiff loaned Defendant an additional $285,000. At this time, the parties signed a promissory note for $500,000 ("Note").[10] The Note states, "THIS PROMISSORY NOTE shall be secured by a Mortgage, filed of record, on the property located at 1000 W. 66th Terrace, Kansas City,

---

Mrs. B. [the seller] told me what was what, and her word was good enough for me." Sam Ro, *Warren Buffett Once Bought a Company from an Uneducated Russian Immigrant after Glancing at her Unaudited Financial Statements*, BUSINESS INSIDER (March 1, 2014 9:15 AM) http://www.businessinsider.com/warren-buffett-on-nebraska-furniture-mart-2014-3.

[10] The $500,000 loan includes the $200,000 initial advance, the $15,000 interest for the advance, and the additional $285,000 loan in January 2007. Thus, the initial advance of $200,000 plus the $15,000 interest payment were rolled over into the $500,000 Note.

14.11.24 Yoder v. Long.wpd

Missouri 64113."[11]  Prior to the Note, Defendant showed Plaintiff the property on 1000 W. 66th

Terrace (Property) and told him that there was $1,000,000 of equity in the Property and that

Plaintiff's $500,000 loan would be protected by a mortgage in the Property.  Plaintiff justifiably

relied upon this material misrepresentation by Defendant.  This conversation occurred prior to

the distribution of the second portion ($285,000) of the loan and renewal of the initial loan.

Plaintiff did not ask Defendant if there were any encumbrances against the Property (there were

lien balances totalling $920,180), and Defendant did not volunteer this information to Plaintiff.

Despite the agreement between the parties to secure the loan with a mortgage, such a document

was never prepared, signed, or recorded by Defendant.  Plaintiff relied upon Defendant to

accomplish this task.

The Note signed by the parties was drafted by an attorney, Barry McCormick.[12]

McCormick was Plaintiff's friend who occasionally provided legal assistance to Plaintiff.

During the discussions between Plaintiff and McCormick during December 2006 and January

2007, the two were in mutual understanding that the Note would be secured by a Deed of Trust.

Plaintiff did not ask McCormick to draft a deed of trust for him because Plaintiff and Defendant

had agreed that Defendant would provide the document and record it because of Defendant's

vast experience in the real estate area.  The evidence demonstrates that Defendant represented

that he would provide a mortgage, and that the mortgage would fully secure the Note.  Plaintiff's

attorney, Barry McCormick, observed that with respect to the Note, Plaintiff was interested in

---

[11] Defendant's Trial Exhibit C; Plaintiff's Trial Exhibit 1.

[12] Defendant's Trial Exhibit SS, McCormick Deposition at 8-13.

- 8 -

14.11.24 Yoder v. Long.wpd

some sort of security,[13] but Plaintiff did not ask McCormick to draft a mortgage because Defendant had done so before and was knowledgeable in real estate. McCormick also observed that Plaintiff was "sophisticated enough to know that he would want some sort of security for a loan of this size."[14] McCormick was referring to the Note—hence, the reference to a mortgage in the Note prepared by McCormick and Plaintiff's reliance on Defendant to prepare and file the mortgage.

At trial, Bernie Shaner, Defendant's appraiser (Appraiser), testified that the Property was appraised in 2006 at $1,500,000 once renovations were complete.[15] At the time of the initial loan to Defendant by Plaintiff, only 50 percent of the renovations were complete. Although Defendant knew that this value assumed many events which had not yet transpired and did not disclose the liens on the Property, he represented to Plaintiff that there was sufficient equity to secure the Note.

Unknown to Plaintiff, at the time the Note was signed, Defendant had already granted two deeds of trust to commercial lenders against the Property totaling $920,180. During the months following the signing of the Note, Defendant repeatedly assured Plaintiff that a mortgage

---

[13] Defendant's Trial Exhibit SS, McCormick Deposition at 12-13.

[14] *Id.* at 13:23-14:2.

[15] Even if Appraiser's testimony were accurate as to value, the ultimate sale price and net proceeds therefrom are an entirely different matter. Closing costs, even at a five percent real estate commission, on a $1.5 million sale would quickly approach $100,000. At the time Defendant showed the Property to Plaintiff and prior to the Note, there already existed total principal owed of $920,180 secured by two mortgages against the Property. This was quickly followed by the further encumbrance of the Property with additional financing liens. The aggregate principal balance secured by the liens against the Property by June 18, 2007, was $1,345,350. This was five months after the Note was effected.

- 9 -

14.11.24 Yoder v. Long.wpd

in his favor had been recorded on the Property to secure the Note. Between January and July

2007, Plaintiff and Defendant met on at least ten occasions. Each time Plaintiff asked for a copy

of the mortgage, and each time Defendant assured him that it was recorded and that he would

send a copy. Jaime McNeil, Defendant's girlfriend at the time, was also well-versed in real

estate transactions. She testified in her deposition, admitted into evidence at trial, that Defendant

acknowledged that he needed and was supposed to file a mortgage in favor of Plaintiff to secure

the Note, but that Defendant wanted to wait until after Defendant had refinanced the original

deed of trust.[16] Jaime McNeil's testimony supports this Court's finding that Defendant

understood when he borrowed money from Plaintiff, a mortgage needed to be filed to secure the

debt. This also supports the conclusion that Defendant misrepresented to Plaintiff that the

mortgage had been filed and that he had intended to file a mortgage to protect Plaintiff and to

secure the obligation with equity in the Property.

In June 2007, Defendant refinanced the Property and borrowed an additional $355,350

against it, bringing the total amount of liens on the Property at that time to $1,345,350. To the

detriment of Plaintiff, Defendant used the Property as a credit card to generate cash. Although it

is not determinative whether equity actually existed in the Property at the time the Note was

executed, Defendant eviscerated any alleged equity over the following five months. Whether

equity existed or did not exist at the time of the Note, Defendant falsely represented that there

was sufficient equity in the Property to fully secure the Note and that a mortgage would be filed.

---

[16] Defendant's Trial Exhibit, Deposition of Jaime McNeil at 28-29. McNeil also assisted Defendant with his accounting books (*id.* at 8); she moved into the Property with Defendant in spring 2007 at which time the renovations were 98-99 percent complete (*id.* at 13).

- 10 -

14.11.24 Yoder v. Long.wpd

Defendant never intended to prepare and record a mortgage to secure the Note.

During the summer of 2007, Defendant approached Plaintiff to borrow an additional $500,000. Plaintiff refused unless he received proof that the Note was secured. When such proof was not forthcoming, Plaintiff refused to lend any additional money to Defendant. The communications from Plaintiff demonstrate that he was surprised and distressed when he learned the Note was not secured.

By July 2007, Defendant had refinanced the deeds of trust that encumbered the Property and Plaintiff had discovered that a mortgage to secure the Note neither existed nor was filed.[17] Defendant offered alternative security by granting a mortgage in some of Defendant's other properties during late 2007 to early 2008. However, Plaintiff's accountant, Bill O'Connor (Accountant), researched the alternative properties and found that none had sufficient equity to secure the Note. Plaintiff called the Note due. As the housing market collapsed, Defendant was not able to pay the Note. Plaintiff filed suit against Defendant in state court shortly thereafter. That case is stayed pending the outcome of Defendant's bankruptcy case.

Defendant is astute, intelligent, and articulate. Unfortunately, much of his testimony is not believable. At the time of the Note, Defendant was quite experienced in real estate purchases and finance. His testimony, and portions of the record, are riddled with examples of his lack of credibility, such as:

(1)     That he did not understand that a mortgage is necessary to secure a loan on real estate.

---

[17] In addition, Defendant had added another $355,500 in deed of trust debt to the Property.

14.11.24 Yoder v. Long.wpd

(2)     That neither Plaintiff nor his son Jay contacted him until July 20, 2007, regarding the

recordation of a mortgage to secure the Note.  Plaintiff credibly testified that he had at

least five to ten conversations with Defendant beginning in January 2007 through July

2007 regarding whether a mortgage had been recorded and in which Defendant insisted

that a mortgage had been recorded.  Some of these conversations were in person, such as

a meeting in Montreal, Canada, as well as two instances in which Plaintiff flew to Kansas

City to meet with Defendant during the spring of 2007.  Of course, there was not a

mortgage to record.  A number of these conversations were overheard by Kimberly

White, Plaintiff's girlfriend at the time.[18]  In her deposition, she testified:

> Well, I was there for a lot of the business discussions.  There was twice inside the
> condo of 1602 that I heard them discuss business and Adam [Defendant] bold-
> faced tell Jim [Plaintiff] that he had the properties recorded.  There was one time
> on the balcony in 1602, outside, and once in his Porsche Cayenne on the way to
> Avenues Bistro.[19]

(3)     That he did not understand the basic aspects of a real estate transaction, a note and a

mortgage.  Defendant's experience in the subprime lending industry and his success in

that industry establish sophistication that belies his assertion.

(4)     That Defendant did not understand a mortgage was necessary to secure a real estate loan

when he granted no less than five mortgages on the Property via initial lending and

additional financing.  When the last mortgage on the Property was filed on June 18, 2007,

---

[18] Defendant's Trial Exhibit VV, Deposition of Kimberly White at 12-13.

[19] *Id.* at 12:19-25.

14.11.24 Yoder v. Long.wpd

the total principal due on the Property debt was $1,345,350.

(5)     That only in hindsight does he realize that on the many properties on which he borrowed money, he signed mortgages because he did not pay attention to what he was signing.

(6)     That Defendant looked at the Note for five minutes and did not realize that the language of the Note required that the debt be "secured," despite language in the second paragraph of the first page that the "NOTE shall be secured by a Mortgage, filed of record, on the property located at 1000 W. 66th Terrace, Kansas City, Missouri 64113."[20]

(7)     That Defendant was unaware the Note was to be secured when Plaintiff and Defendant discussed security for the loans more than one month prior to the effectuation of the Note.

(8)     That Defendant told Plaintiff that the Note's security interest would be subject to "permanent financing" on the Property, but then proceeded over the next five months to add $355,500 in debt secured by the Property. A portion of this additional debt secured by the Property was associated with the costs of renovation.

In reality, Defendant understood at the time the Note was effected that the Note was to be secured by an interest in the Property but did not undertake the creation, execution, or filing of a mortgage in any real property and, in particular, in the Property.  Defendant falsely represented and stated intentions that the Note would be fully secured by real estate.  Defendant purportedly considered Plaintiff a good friend, yet did not undertake any measure to assure Plaintiff was

_____

[20] Defendant's Trial Exhibit C.

14.11.24 Yoder v. Long.wpd

protected on the Note.  Defendant referred to himself as a member of Plaintiff's family.

Kimberly White, Plaintiff's girlfriend at the time, echoed this sentiment.  She further commented that:

> I can just be vague and say that Adam [Defendant] was constantly at our place, is very friendly.  It was like family.  You know, they–Jim [Plaintiff] and–I mean Jay [Plaintiff's son] and him had been old lost friends.  You know, they were reconnecting.  You know, Jim, you know, treated him like a son.  So–and I want that on the record that we were–we were very fooled.  It's like having your own son, you know, steal money from you.[21]

On July 20, 2007, Defendant sent an email to his assistant with a request regarding the filing of Plaintiff's non-existent mortgage ("Email") that stated in part:[22]

> Melinda,
>
> Back in February, I gave you the note for Jim Yoder's loan.  You were supposed to have it filed with Coffelt title after I had Heartland bank paid off.  Did you ever take that note to them?
>
> Please let me know as soon as possible.  It looks like Coffelt did not record this and Jim is very upset about it.
>
> Adam

The Email was sent after Defendant had encumbered the Property in the principal sum of $1,345,350.  This Court does not believe the substance of the Email.  The Email was constructed to establish the false impression that Defendant believed that a mortgage had been filed.  The Email refers to the filing of the Note, continuing the ruse that Defendant believed that a note and

---

[21] Defendant's Trial Exhibit VV, Deposition of Kimberly White at 19:2-10.

[22] Plaintiff's Trial Exhibit 8.

14.11.24 Yoder v. Long.wpd

not a mortgage should be filed. Defendant had been asked many times by Plaintiff for a copy of the mortgage, which Defendant assured Plaintiff he possessed, and Defendant assured Plaintiff that he would send a copy of the mortgage to Plaintiff. Defendant maintained that he had possession of the mortgage and that "his girl" had filed it. All that Plaintiff had in his possession was a copy of and not the original Note. This Court does not believe the content of the Email, and the Email actually reinforces this Court's conclusion that Defendant's testimony is contrived. Defendant is attempting to blame a secretary for his failure to secure the Note.

Before the Note was effectuated, Defendant showed Plaintiff approximately 15 real properties and alleged that equity in these properties was also a component of the lending. Defendant asserted that equity in the real properties, in particular the equity in the Property, would be sufficient to collateralize and fully secure the Note. At the time the Note was signed, Defendant had already granted two deeds of trust in the Property in the amount of $920,180. In order for Plaintiff to have been fully secured, the Property needed to be worth more than the asserted value of $1,490,000. When the Property was eventually sold in July 2008, the purchase price was only $673,000 and there was no indication that it was ever worth much more than that.

The Accountant testified that through June 2007, Defendant told him Plaintiff was secured.[23] The Accountant understood that the Note was fully secured by equity in the Property and that there was back up collateral available.[24] Also, the Accountant's knowledge five months

---

[23] Defendant's Trial Exhibit TT, Deposition of William O'Connor at 101:13-19.

[24] *Id.* at 107:19-25 and 108:7-12.

- 15 -

14.11.24 Yoder v. Long.wpd

after the Note was executed does not reflect Plaintiff's knowledge at the time the Note was executed. The Accountant did not review the transaction until after the Note, and he did not participate in the original transaction because Plaintiff believed there was sufficient equity in the Property.[25] The Accountant's testimony is consistent that it was Plaintiff's impression that the Note was fully secured. During the summer of 2007, the Accountant discussed with Defendant the latter's request that Plaintiff loan another $500,000 to Defendant; however, the Accountant sought assurances that there was sufficient equity in the Property to collateralize the Note and any additional contributions. Once Plaintiff realized that the Note was not collateralized, which rendered the existence of equity irrelevant, he refused to loan additional funds to Defendant absent full collateralization and because his faith in Defendant's representations had evaporated. Defendant makes much of the Accountant's email to Plaintiff dated July 20, 2007,[26] to argue that the relationship between Plaintiff and Defendant was not that of lender/borrower, but that of partners. This email states in part:

> In essence, you [Plaintiff] are Adam's [Defendant's] partner in the deal and the 30% is a partner-like return, but Adam needs to drastically improve partner communication style and communicate what collateral really backs up your note (and how the liquidity/cash flow will work from prop sales of all types) to re-build any confidence.

This email was sent by the Accountant to Plaintiff and is dated July 20, 2007, well after the relationship between the parties had deteriorated during the summer of 2007. The Court gives

---

[25] *Id.* at 77:13 to 78:6.

[26] Defendant's Trial Exhibit K.

- 16 -

14.11.24 Yoder v. Long.wpd

Case 09-06172    Doc# 121    Filed 12/01/14    Page 16 of 38

no weight to the Accountant's offhand remark[27] that Plaintiff and Defendant were in essence in a partnership. This is a legal conclusion to be decided by this Court. The facts of the case have established that Plaintiff and Defendant were in a lender/borrower relationship when Plaintiff loaned $500,000 to Defendant as evidenced by the Note. To the extent that it is relevant at all, the Accountant's comment in the email is incorrect. The Accountant also testified that he did not consider Plaintiff's loan to Defendant to create equity in the Property or an unsecured position; to the contrary, the loan was to be made as a secured position with equity in the Property. The other real property was to serve as backup collateral for liquidity.[28] This understanding was conveyed to the Accountant by Defendant on January 22, 2007, four days after the Note was executed. The Accountant considered Defendant an expert or a professional in the mortgage industry, and Defendant indicated to the Accountant that Plaintiff had a secured collateral position in the Property.[29] The Accountant's email also reflects that over one-half of Plaintiff's initial $500,000 investment was paid as a deposit for 30 inner-city duplexes. Defendant's investment in this larger multi-family development further reflects a high level of real estate investment sophistication. Regarding these post-transaction communications with Defendant, the Accountant stated:

> I think, you know, my interpretation of what Adam [Defendant] had told me was

---

[27] Defendant's Trial Exhibit TT, O'Connor deposition at 93:19-25. This observation by the Accountant reflected his assessment that Plaintiff held a note without "clear collateral value" and that Plaintiff would have to recover on the Note through alternative means or by becoming an equity partner.

[28] *Id.* at 106:3-24.

[29] *Id.* at 108:7-12.

14.11.24 Yoder v. Long.wpd

that there was sufficient equity in 1000 West 66th to collateralize Mr. Yoder's [Plaintiff's] loan, and if there was not there was additional collateral, standby sources, that would back that up that would provide a secondary and tertiary provision of collateral to secure that note.[30]

The Accountant learned that the Property may have been encumbered by a lien that predated the Note, although this knowledge was obtained after effection of the Note, and his understanding from Defendant was that the Note was fully collateralized. This evidence does not establish that Defendant did not represent to Plaintiff that the Note would be fully secured or that Defendant revealed to Plaintiff that the Property was already encumbered. The Accountant's conversations with Plaintiff and Defendant during the January 2007-summer 2007 period were consistent with the Note being collateralized.[31] Regardless, there is no credible evidence that the existence of encumbrances on the Property was communicated to Plaintiff; what was communicated was that there was significant equity in the Property that was sufficient to collateralize the Note.

Email communications between the Accountant and Plaintiff also reflect Defendant's desperate attempts during the summer of 2007 to borrow another $500,000 from Plaintiff as the business scheme unraveled. Plaintiff, having discovered that the initial $500,000 loan was not secured, was distressed with the situation and unwilling to loan additional funds absent full collateralization. An email from Defendant to the Accountant[32] reflects the contours of the

---

[30] *Id.* at 107:19 to 108:1.

[31] *Id.* at 115-118, 120.

[32] Defendant's Trial Exhibit P.

- 18 -

14.11.24 Yoder v. Long.wpd

relationship on July 23, 2007:

> Just to follow up with our conversation, you are coordinating with Jim [Plaintiff] and his attorney, correct? I need to know by mid day tomorrow at the latest if he intends to go forward with the next 500k. If not, I am flying another money guy in and putting him up for a few days to take his place. Don't want to do it but he leaves me no choice here. Hopefully he cools down today.

An email dated August 1, 2007,[33] from Plaintiff to Defendant reflects in part Plaintiff's understanding of the relationship with Defendant:

> All I am saying is what I have said all along. I will give you money, but I have to be completely collateralized in a first position. I cannot take any chances on losing my money. I am better off in a Raymond James fund paying 15% than with you paying 30% if I am not protected.

Following these business practices, Defendant's business enterprise unravelled. When the housing bubble collapsed in 2008 and the "Great Recession" ensued, Defendant's scheme imploded.

## ANALYSIS

**I.    Defendant's debt to Plaintiff in the amount of $912,000 is not dischargeable under § 523(a)(2)(A).**

Plaintiff's dischargeability claim against Defendant arises from 11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
> . . .
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
> > > (A) false pretenses, a false representation, or actual fraud, other than a

---

[33] Defendant's Trial Exhibit Q.

14.11.24 Yoder v. Long.wpd

statement respecting the debtor's . . . financial condition . . . .

The analysis under this section "begins 'with the recognition that exceptions to discharge are narrowly construed, and because of the fresh start objectives of bankruptcy, doubt as to the meaning and breadth of a statutory exception is to be resolved in the debtor's favor.'"[34] However, the Code "has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'"[35]

Section 523(a)(2)(A) requires a creditor to meet the following factors to except a debt from discharge: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor to sustain a loss.[36] Under this section, the debtor's intent to deceive must be subjective and "may be inferred from the totality of circumstances, or 'from a knowingly made false statement.'"[37] Whether a creditor justifiably relied on a debtor's statement is also subjective.[38] To discern whether a creditor's reliance is justifiable, courts should "examine 'the qualities and

---

[34] *Bartley v. Jacobson (In re Jacobson)*, 485 B.R. 255, 261 (Bankr. D. Kan. 2013) (quoting *DSC Nat'l Properties, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 168 (B.A.P. 10th Cir. 2012)).

[35] *Cohen v. De La Cruz*, 523 U.S. 213, 217 (1998) (citation omitted); *see also Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("[A] debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy.").

[36] *In re Jacobson*, 485 B.R. at 261.

[37] *Id.* (quoting *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir. 1996)).

[38] *See Field v. Mans*, 516 U.S. 59, 76 (1995).

- 20 -

14.11.24 Yoder v. Long.wpd

characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases.'"[39]

The exception to discharge under § 523(a)(2)(A) does not include oral statements respecting the debtor's financial condition,[40] which are subject to § 523(a)(2)(B) for false statements "that purport to present a picture of the debtor's overall financial health."[41] Statements that meet this definition include: "those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities."[42] These statements do not necessarily need to be as formal as a balance sheet, income statement, or statement of net worth, but the statements must refer generally to the financial position of Defendant. Oral statements regarding specific assets are not included in this exception and therefore do not prevent a debt from being nondischargeable under § 523(a)(2)(A).

Here, Plaintiff seeks relief under § 523(a)(2)(A) and alleges Defendant made false representations to Plaintiff with intent to deceive, upon which Plaintiff justifiably relied and which caused Plaintiff loss. Defendant told Plaintiff that the Note would be secured and that the

---

[39] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 792 (10th Cir. 2009), quoting *Field v. Mans*, 516 U.S. at 71.

[40] *See* § 523(a)(2)(B). *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2011).

[41] *Id.* at 707.

[42] *Id.* at 714.

14.11.24 Yoder v. Long.wpd

security for the Note would be not only the Property, but also other real property Defendant owned would be backup collateral. Defendant represented to Plaintiff that the collateral for the Note was sufficient to fully secure the Note. The statement by Defendant that the Note would be secured by any of the property he owned specifically refers to the ability to secure the Note, not to Defendant's general wealth. This is similar to the facts in *In re Joelson* where the Tenth Circuit held that a defendant's statement that he would be able to obtain financing from his brother was not a statement about his overall financial condition because it was a statement about "one part of Joelson's income flow."[43] Here, the statement that Defendant would provide all of his property as security referred to a collateral position to fully secure the Note and was not a statement referring to Defendant's overall financial health. At the time Defendant made these representations to Plaintiff, Defendant knew the statements were false because he never intended to secure the Note with a mortgage in the Property or in any other property owned by Defendant; in addition, there was not sufficient equity in the Property to fully secure the Note even if the mortgage were filed. What Defendant did do was to load up the Property with encumbrances that eventually consumed any possible equity.

Defendant argues that the parol evidence rule prevents Plaintiff from claiming additional terms to the agreement that were not expressly provided for in the contract. However, this argument is unavailing. First, parol evidence is admissible for claims of fraud in the

---

[43] *Joelson*, 427 F.3d 715.

14.11.24 Yoder v. Long.wpd

inducement.[44]  Second, the Note does not contain an integration clause.  Third, the Note, which is the contract at issue here, expressly states that the loan would be secured by a mortgage.  Because the Note is silent as to whose responsibility it was to file the deed of trust, parol evidence is admissible to fill in the gap.  Since it is necessary to consider evidence outside the Note to determine what the parties intended when they included the condition that the Note be secured by a mortgage, the Court may consider parol evidence.

The evidence establishes that Defendant made false representations with the intent to deceive Plaintiff and to induce Plaintiff to loan money to Defendant.  Plaintiff's justifiable reliance on these misrepresentations proximately caused the debt evidenced by the Note.  Defendant testified that he did not realize that a separate document was required to grant a mortgage against a property.  This testimony is inconsistent with Defendant's education, experience and knowledge, as well as his representations to Plaintiff.  Defendant studied business in college and then worked for several years in mortgage financing.  Defendant stopped selling secured real estate loans when his house rehabilitation business started to take off.  Defendant was involved extensively in the buying and selling of houses and other real estate, which of necessity involved the collateralization of debt with mortgages.  His claim that he did not realize that a mortgage was necessary in addition to a promissory note to collateralize a real estate loan is not believable.  Instead, the testimony shows that Defendant made the representations with the intent to deceive Plaintiff and to induce Plaintiff into lending money and

---

[44]  *Pinken v. Frank*, 704 F.2d 1019, 1022 (8th Cir. 1983); *Ramada Franchise Sys., Inc. v. Tresprop, Ltd.*, 188 F.R.D. 610, 614 (D. Kan. 1999).

- 23 -

14.11.24 Yoder v. Long.wpd

renewing credit.  Defendant engaged in a scheme to dupe Plaintiff into loaning Defendant money

on an unsecured basis and with little real prospect for repayment.  In *Joelson*, the Tenth Circuit

Court of Appeals affirmed the bankruptcy court's finding that debtor's debt to plaintiff was not

dischargeable under § 523(a)(2)(A). The facts in *Joelson* are similar to Defendant's "courtship"

of Plaintiff and ultimate defrauding of Plaintiff:

> [Plaintiff] is a single, retired man who lives in Casper, Wyoming. [Plaintiff] met
> [debtor] at a café in Casper where she was working as a waitress. Around March
> 1996, [debtor] told [plaintiff] that she needed to travel to Scottsdale, Arizona to
> check on a house that she owned and pick up her mother.

> [Plaintiff] agreed to drive [debtor] from Casper to Scottsdale. While [plaintiff]
> and [debtor] were in Scottsdale, someone gave [debtor] money. [Debtor]
> represented to [plaintiff] that the money was rent for the house that she owned in
> Scottsdale.

> After [plaintiff] and [debtor] returned to Casper, [debtor] informed [plaintiff] that
> she needed a loan of over $50,000 to save her Scottsdale home from foreclosure.
> [Debtor] stated that her brother, Larry Oltman, would later loan her these funds,
> and that as soon as Oltman did so, she would repay [plaintiff]. [Debtor] promised
> that she would provide [plaintiff] with collateral to secure the loan and
> represented that she owned residences in both Casper and Glendo, Wyoming; a
> motel in Glendo; and a number of antique vehicles stored in Glendo. When
> [plaintiff] asked to see the properties, [debtor] took [plaintiff] to Glendo and
> showed [plaintiff] the inside of a house, the outside of another house and a motel,
> and a storage facility in which the antique cars were allegedly housed. [Debtor]
> also provided [plaintiff] with a list of the antique cars that she allegedly owned.

> After he viewed the properties, [plaintiff] mortgaged his home and borrowed over
> $50,000. [Debtor] gave [plaintiff] a promissory note, **[FN1]** and the two traveled to
> Arizona, where they met with a lender's representatives regarding the foreclosure.
> In the course of these dealings, [plaintiff] learned that the Arizona property was
> titled in the name of "Joelene M. Joelson." However, [plaintiff] knew Debtor as
> "Jeanne Joelson," not "Joelene M. Joelson." After Debtor told [plaintiff] that she
> and "Joelene M. Joelson" were the same person, [plaintiff] advanced
> approximately $54,000 to [debtor] to pay off the Deed of Trust.

- 24 -

14.11.24 Yoder v. Long.wpd

[Plaintiff]'s attempts to collect the loan have proved fruitless, as [debtor] has not repaid the loan or forfeited collateral. [Debtor] has rebuffed [plaintiff]'s claims by asserting that she never had an interest in the Scottsdale property and that the funds that [plaintiff] gave to her in connection with that property were a gift.[45]

> **[FN1]**. The promissory note is not part of the record, and there is no indication in the opinions of the bankruptcy court or the BAP as to the note's contents. Thus, it is not clear whether all of the properties and the antique cars that [debtor] said she owned were intended as collateral. However, we need not determine what [debtor] listed as collateral in the note in order to resolve this appeal. This is because we only need consider the fact that [debtor] made representations as to her ownership of various properties and vehicles in order to obtain a loan from [plaintiff].]

Here, the Court finds that Plaintiff relied on Defendant's representations and that his reliance was justifiable. The standard of justifiable reliance does not look to whether a creditor reasonably relied on a debtor's misrepresentations based on a community standard of reasonable behavior. Instead, a creditor's reliance is justifiable unless he could have ascertained the falsity of the statements if he had "utilized his opportunity to make a cursory examination or investigation."[46] However, this requirement does not go so far as to require a creditor to check the courthouse for unsatisfied mortgages when a debtor claims that the property is free from encumbrances.[47] When a court is determining whether a creditor's reliance was justifiable, the court must also take into consideration the sophistication of the individual creditor. The less reasonable a creditor's reliance, the more difficult it is to prove reliance in fact.[48] Furthermore,

---

[45] *Joelson*, 427 F.3d 703.

[46] *Field v. Mans*, 516 U.S. 59, 71 (1995) (citing RESTATEMENT (SECOND) OF TORTS § 545A, cmt. *b* (1976)).

[47] *Field*, 516 U.S. at 70 (citing RESTATEMENT (SECOND) OF TORTS § 540, Illustration 1).

[48] *See Field*, 516 U.S. at 76.

14.11.24 Yoder v. Long.wpd

courts have held that a creditor's reliance can become unjustifiable if he continues to lend money after learning of facts that should have alerted him to the defendant's fraud.[49]

Here, Plaintiff routinely made business deals based on his ability to ascertain the character of those with whom he dealt.[50] That strategy had served Plaintiff well. Plaintiff did not lend money to Defendant until the two had met on several occasions to establish a relationship. Although Plaintiff had significant financial resources, he lacked the technical savvy that financial institutions and other real estate lenders have. Because Plaintiff acted pursuant to his proven business strategy, and because he lacked the accounting savvy to perform the due diligence that most banks would have done before lending such a large sum of money, the Court finds that Plaintiff in fact relied on the false representations of Defendant and that his reliance was justified. Moreover, after Plaintiff learned that Defendant never created or recorded a deed of trust to secure the Note, Plaintiff refused to lend Defendant more money. This supports the Court's conclusion that Plaintiff justifiably relied on Defendant's promise to secure the Note at the time the parties signed it. Interestingly, Defendant testified that he could have procured a $500,000 loan from any number of commercial banks with whom he had a relationship. If this were the case, why would he borrow money at 30 percent interest from Plaintiff? This Court's conclusion is that Defendant was becoming desperate for funds and that he could not have duped

---

[49] *In re Riebesell*, 586 F.3d 782, 792 (upholding bankruptcy court's findings that after a certain point, creditor's reliance became unjustifiable, and therefore the additional loans were dischargeable.).

[50] *Riebesell* is also instructive here. In that case, the court held that the level of trust between the parties, demonstrated by their relationship, constituted additional support for the court's conclusion that the plaintiff justifiably relied on the defendant. *Id.* at 792. In *Riebesell*, the debtor was an attorney and the creditor an individual for whom debtor had provided legal services.

- 26 -

14.11.24 Yoder v. Long.wpd

a commercial lender into lending $500,000 on an unsecured basis.

The final element remaining under § 523(a)(2)(A) is whether the creditor sustained a loss as a result of his reliance on a defendant's false representations. Here, Plaintiff sustained a loss when Defendant failed to create and file a mortgage against either the Property or any of Defendant's other properties as he represented. Although it is questionable whether Plaintiff would have been fully secured if Defendant had filed a deed of trust against the Property, Defendant made statements that he had plenty of equity in his other properties to protect Plaintiff. These statements were made to Plaintiff to induce him to lend as much money as possible. The evidence was unclear whether the promise to secure Plaintiff's loan came before or after the initial disbursement of $200,000. However, Plaintiff carried the burden of proof to demonstrate that this promise was made and justifiably relied upon when Plaintiff made the decision to renew the first loan for $200,000, plus the accrued interest of $15,000.[51] The record demonstrates that Defendant promised to file a mortgage in favor of Plaintiff and to protect Plaintiff, when in fact he never intended to do so.[52] Because the entire balance due on the note meets the requirements of § 523(a)(2)(A), it is nondischargeable. On the petition date, the total

---

[51] Signing the Note constituted a "renewal" to the extent that the advancement is considered a separate loan. *See Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 790 n.4 (10th Cir. 2009).

[52] It is Defendant's assertion that he intended to file a mortgage after final financing on the Property. Even if one were to believe Defendant's and his ex-girlfriend's testimonies to this effect, Plaintiff would still prevail. When the financing was complete on the Property in June 2007, the total principal debt was $1,345,350, and even based upon a doubtful valuation of $1.5 million for the Property, there was little, if any, equity to secure the Note. Regardless, it was Plaintiff's logical inference that the Note would be immediately secured by the Property or other real estate. Defendant never prepared a mortgage or attempted to file a mortgage to secure the Note. It is this Court's conclusion that under these facts, Defendant never intended to secure the Note.

- 27 -

14.11.24 Yoder v. Long.wpd

amount of the claim was $912,000.[53]  This amount is excepted from discharge in Defendant's

bankruptcy case.  The Court enters judgment for Plaintiff for $912,000.[54]  The Court, in its

discretion, declines to award prejudgment interest accruing after the petition date.[55]  Plaintiff is

entitled to post-judgment interest at the statutory rate.[56]

## II.    Sanctions are appropriate under Rule 37 because Plaintiff withheld evidence in discovery which required Defendant to conduct expensive and unnecessary electronic discovery.

Defendant filed a motion for sanctions[57] based on Plaintiff's failure to comply with the

Court's discovery Order.[58]  According to Defendant, Plaintiff wrongfully withheld emails during

discovery and failed to provide a privilege log explaining the omission.  This caused Defendant

to spend additional time and resources recovering the documents.  Defendant also asserts that

although Plaintiff claimed to have lost access to the emails, Plaintiff had actually recovered them

prior to the state court trial via the Accountant.  Defendant argues that Plaintiff's obligation to

produce the documents continued throughout the trial.  Because Plaintiff did not produce the

---

[53]  11 U.S.C. § 502.

[54]  This Court has jurisdiction to declare the debt nondischargeable, to liquidate the debt, and to enter a monetary judgment against the Debtor.  *Riebesell*, 586 F.3d at 793-94; *see also Deitz v. Ford (In re Deitz)*, 760 F.3d 1038 (9th Cir. 2014) (adopting the lower court's decision in *Deitz v. Ford*, 469 B.R. 11 (B.A.P. 9th Cir. 2012), reaching the same conclusion in the wake of the decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011)).

[55]  *Diamond v. Bakay (In re Bakay)*, 454 Fed. App'x 652, 654 (10th Cir. 2011) (citing *Turner v. Davis (In re Inv. Bankers, Inc.)*, 4 F.3d 1556, 1566 (10th Cir. 1993)).

[56]  28 U.S.C. § 1961.

[57]  Doc. 114.

[58]  Doc. 92.

- 28 -

14.11.24 Yoder v. Long.wpd

documents, Defendant was required to obtain leave of this Court to conduct an expensive search of the Accountant's computer.

At issue are five email conversations which Defendant provided at trial over Plaintiff's continued evidentiary objection. Plaintiff did not initially disclose the requested emails because, according to Plaintiff, the email accounts had become inaccessible. After a pretrial hearing, this Court directed the parties to proceed with discovery and provided for Defendant to recover the emails from the Accountant's laptop. Defendant successfully recovered the emails and presented them at trial. Once the emails were obtained by Defendant, Plaintiff asserted that the contested emails were all protected as settlement discussions and that Defendant's Trial Exhibits M and N were protected under the Attorney-Client privilege. This was the first time any issue of privilege was raised. The emails at issue were introduced at trial as Defendant's Trial Exhibits K, M, N, O, and II. Defendant contests the sufficiency of Plaintiff's justifications for not providing either the documents or a privilege log, and after considering the evidence, the Court agrees with Defendant.

The Federal Rules of Civil Procedure allow for the discovery of evidence that may not be admissible at trial. Under Fed. R. Civ. P. 26(b)(1), absent an order of the court limiting discovery, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense–including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." "Relevant information need not be admissible at the trial if

- 29 -

the discovery appears reasonably calculated to lead to the discovery of admissible evidence."[59] Fed. R. Civ. P. 26(b)(1) provides that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."

Essentially, evidence is discoverable if it is either admissible or "reasonably calculated to lead to the discovery of admissible evidence," and it is not privileged. If the documents sought to be discovered are privileged, the party asserting the privilege must "expressly make the claim, and describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."[60]

Plaintiff's responses to the Motion for Sanctions focus on the assertion that the documents were either privileged or inadmissible. However, Plaintiff never produced a privilege log, which would have allowed Defendant to determine whether to challenge the claimed privilege. At a status conference on November 15, 2011, Defendant objected to Plaintiff's failure to provide the requested documents or produce a privilege log. Shortly after the hearing, the parties submitted an agreed Order directing Plaintiff to turn over the Accountant's laptop so Defendant could search the hard-drive for the emails. Defendant found the emails on the laptop but, in doing so, was forced to hire an e-discovery company. The reason Defendant filed the instant motion for sanctions is that after uncovering the emails, Defendant found an email

---

[59] FED. R. CIV. P. 26.

[60] FED. R. CIV. P. 26(b)(5)(A).

14.11.24 Yoder v. Long.wpd

conversation between Plaintiff and the Accountant from August 20 and 21 of 2009 in which the Accountant forwarded to Plaintiff all the allegedly lost emails.[61]  Defendant argues the emails are not protected under either Fed. R. Evid. 408 or attorney-client privilege, and the failure to provide the emails should result in sanctions to Plaintiff.  After considering the arguments and evidence presented by the parties, the Court agrees with Defendant. However, the Court also finds the emails were of little or no value to Defendant's defense of this case.

As noted *supra*, if the disputed emails were privileged, then Plaintiff was under no obligation to produce them in discovery and was only obligated to produce a privilege log.  If however, the emails were not privileged, then Plaintiff's failure to produce them was a violation of Rule 26.  Plaintiff's first argument states that each of the emails arose after Plaintiff realized that a mortgage had never been filed against the property, and therefore each email constituted settlement negotiations.  Rule 408(a) of the Federal Rules of Evidence states:

> Evidence of the following is not admissible–on behalf of any party–either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or contradiction:

> (1) furnishing, promising, or offering–or accepting, promising to accept, or offering to accept–a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim . . . .

Rule 408 limits the admissibility of evidence; it does not prevent the evidence from being discoverable.  However, even if the settlement negotiations were privileged, none of the disputed

---

[61]  Defendant's Trial Exhibit II.

14.11.24 Yoder v. Long.wpd

exhibits involved email conversations between Defendant and Plaintiff and cannot be said to be statements made during compromise negotiations.[62]

Defendant's Trial Exhibit K is an email conversation between Plaintiff and the Accountant regarding a conversation between the Accountant and Defendant. The emails in the exhibit show Accountant's thoughts about the promissory note and the business relationship between Defendant and Plaintiff. There is no mention of settlement or any other attempt to resolve the dispute in the Exhibit K emails.

Exhibits M and N were contested as attorney-client privilege, so the Court will discuss those emails below. Exhibit O contained emails from Defendant to Accountant from July 2007 regarding the cash-flow of Defendant's business at the time. This conversation was not related to solving any dispute and cannot be considered settlement negotiations.

Exhibit II was an email correspondence between Plaintiff and the Accountant regarding the missing emails. This conversation was not related to any settlement discussions, but certainly would have led to the discovery of admissible evidence. Once the Accountant turned over the emails, Plaintiff was required under Rule 26 to provide the documents to Defendant and to provide an updated privilege log. Plaintiff undertook neither of these actions.

Returning to Exhibits M and N, the evidentiary issue is whether these qualify for the attorney-client privilege protection, but the discovery issue remains the same as the other exhibits. Generally, communications between the attorney and the client are protected from

---

[62] An argument could be made that these emails are protected as trial preparation materials, but that argument is not before the Court.

14.11.24 Yoder v. Long.wpd

disclosure.[63]  This protection is necessary to allow open and honest discussions between the

attorney and his client.[64]  However, this protection is strictly construed, and generally does not

extend to communications involving a third party.  The emails in Exhibits M and N were initially

conversations between Plaintiff and his counsel, John Campbell.  However, the emails were all

forwarded to the Accountant.  By including the Accountant in the conversation, Plaintiff waived

his privilege.  Plaintiff argues that the inclusion of the Accountant in the conversation should not

waive the privilege because his knowledge was necessary to make an informed legal decision.

To support this position, Plaintiff cites *United States v. Kovel*,[65] a decision by the Second Circuit

Court of Appeals.  In that decision, the well-respected Judge Henry Friendly stated "[a]ccounting

concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in

some cases."[66]  Accordingly, Judge Friendly went on to hold that "the presence of an accountant,

whether hired by the lawyer or by the client, while the client is relating a complicated tax story

to the lawyer, ought not destroy the privilege[.]"[67]

    In a later Second Circuit decision, *United States v. Ackert*,[68] the court limited the *Kovel*

analysis and held that the attorney-client privilege does not apply to all communications shared

---

[63]  *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

[64]  *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[65]  296 F.2d 918 (2d Cir. 1961).

[66]  *Id.* at 922.

[67]  *Id.*

[68]  169 F.3d 136.

- 33 -

14.11.24 Yoder v. Long.wpd

with accountants. In *Ackert*, a non-practicing attorney working as a financial advisor was brought in on discussions relating to the taxes of a proposed investment. The accountant argued that the *Kovel* decision required a finding that the conversation was privileged, but the court held that the accountant's role was not necessary to provide legal advice and that communications that merely aide the attorney do not necessarily fall under the protection.

Here, Accountant's role was not that of an interpreter because the legal relationship between Plaintiff and Defendant was straightforward and easily discernable. Moreover, the Accountant was not included in the conversation at the behest of Plaintiff's attorney in order to help decipher the relationship; instead he was voluntarily included by Plaintiff. Because the email conversations from Exhibits M and N were voluntarily forwarded to Accountant, Plaintiff waived his right to assert protection under the attorney-client privilege.

The Court finds the exhibits were improperly withheld during discovery and that Plaintiff not only failed to disclose the documents, but withheld them after recovering them from Accountant. This resulted in Defendant spending a large amount of time and money to recover the emails from Accountant's laptop. This is a violation of the language and purpose of Rule 26.

The next issue is whether this violation of Rule 26 is sufficient to justify sanctions as requested by Defendant. Rule 37 of the Federal Rules of Civil Procedure provide for sanctions if a party fails to cooperate in discovery. Rule 37 also provides a guide for parties who disagree over discovery issues. The first step is to contact the other party and try to resolve the issue.[69] If

---

[69] FED. R. CIV. P. 37(a)(1).

- 34 -

14.11.24 Yoder v. Long.wpd

the allegedly recalcitrant party is still not forthcoming, then the other party may move for an

order to compel.[70]  At the pretrial conference on November 15, 2011, the issue was discussed and

the parties submitted their agreed order.  At the time, it was unknown that Plaintiff had already

recovered the disputed emails from the Accountant.  Had Plaintiff provided a privilege log and

not misled the Court regarding the existence of the emails, Defendant would not have been

required to expend time and money recovering the emails.  Because the Court granted

Defendant's Motion to Compel and required that Accountant turn over the laptop, Rule 37(a)(5)

states that, after providing an opportunity to be heard, the party whose conduct necessitated the

motion must pay the movant's reasonable expenses incurred in making the motion, including

attorney's fees.  The Court need not award these fees, however, if "(i) the movant filed the

motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii)

other circumstances make an award of expenses unjust."[71]

     Here, Defendant attempted to resolve the issue without court action.  The next issue is

whether the omission of the documents was substantially justified, or if there were other

circumstances that would make an award of expenses unjust.  If Plaintiff did not have access to

the emails as claimed, and therefore was not exactly certain of the content of the conversations,

then the claim of privilege would seem substantially justified.  That would also help explain the

---

[70]  FED. R. CIV. P. 37(a)(3).

[71]  FED. R. CIV. P. 37(a)(5)(A)(i)-(iii).

14.11.24 Yoder v. Long.wpd

lack of a privilege log.  However, the evidence shows Plaintiff was in possession of the emails and still refused to provide a privilege log or comply with the discovery request.  The Court finds the position taken by Plaintiff was not substantially justified.  However, the Court does find other circumstances that would make award of Defendant's expenses unjust.

In Defendant's Supplemental Motion for Sanctions,[72] Defendant claims the total amount of costs and expenses required to recover the emails was $14,716.00.  The Court has reviewed Defendant's statement of fees and costs in support of Defendant's motion.  The computer forensic fees of $2,999 are reasonable.  Attorney's fees in the amount of $2,450[73] are reasonable.  Therefore, the amount of $5,449 is awarded to Defendant against Plaintiff for failure to comply with Fed. R. Civ. P. 26.  This amount is offset against the $912,000 judgment in Plaintiff's favor set out above.

### III.     Motion for Judgment on Partial Findings

After the close of Plaintiff's case-in-chief, Defendant orally moved for a directed verdict.[74]  Motions for Judgment on Partial Findings are governed by Rule 52 of the Federal Rules of Civil Procedure and incorporated into bankruptcy proceedings under Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Rule 52(c) provides the court discretion to enter judgment on partial findings, and a court need not make any determination until the close of

---

[72]  Doc. 114.

[73]  Attorney's fees are calculated at counsel's hourly rate of $175 multiplied by the 14 hours of attorney time that are reasonable and sufficiently limited to the discovery dispute.

[74]  The Court treats this motion as a Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c). A motion for directed verdict no longer exists under the Federal Rules of Civil Procedure.

- 36 -

14.11.24 Yoder v. Long.wpd

evidence. The Court determines that the Motion for Judgment on Partial Findings is moot based upon the Findings of Fact and Conclusions of Law stated *supra*.

## CONCLUSION

After reviewing the evidence adduced at trial, deposition transcripts and video depositions, and considering the briefs filed by the parties, the Court determines that the $912,000[75] debt owed to Plaintiff James Yoder by Defendant Adam Long on the bankruptcy petition date is nondischargeable because it was for money, property or the refinancing or renewal of credit obtained by false pretenses, false representations, or actual fraud by Defendant, and the Court enters judgment in the amount of $912,000. The Court also grants Defendant's Motion for Sanctions, which sanction is the amount of $5,449, which sum shall be applied to and reduce Plaintiff's money judgment. After this setoff, the judgment is reduced to a net judgment of $906,551 in Plaintiff's favor. The Motion for Directed Verdict is denied as moot. A separate entry of judgment will be entered in accordance with this decision.

IT IS ORDERED that except as otherwise provided herein, Plaintiff's costs in this action are assessed against Defendant pursuant to Fed. R. Bankr. P. 7054(b).

IT IS FURTHER ORDERED THAT the foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. The judgment based on this ruling will be entered

---

[75] This amount is reduced by the sanction of $5,499 in Defendant's favor against Plaintiff; the net judgment is $906,501. The setoff of the discovery sanction against Plaintiff's judgment is appropriate. *See Weisberg v. Weisberg (In re Weisberg)*, 218 B.R. 740 (Bankr. E.D. Pa. 1998), in which the bankruptcy court set off a possible nondischargeable attorney fee claim against a postpetition claim against the same attorney for violation of the automatic stay.

14.11.24 Yoder v. Long.wpd

on a separate document as required by Fed. R. Bankr. P. 7058 and Fed. R. Civ. P. 58.

IT IS SO ORDERED.

### 

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS

14.11.24 Yoder v. Long.wpd